UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GERALD COOK,<br><br>Defendant. | ) | Criminal No. 26-113 (PLF) |

OPINION

Pending before the Court is Defendant Gerald Cook's Motion to Suppress Tangible Evidence ("Mot.") [Dkt. No. 31].[1] Mr. Cook has been charged with two counts of possessing a firearm after having been convicted of a crime punishable by a term exceeding one year in violation of 18 U.S.C. § 922(g)(1), and one count of assault with a dangerous weapon in violation of D.C. Code § 22-402. See Indictment. In the early hours of November 1, 2025, officers recovered firearms and other evidence from a vehicle registered to Mr. Cook, parked in the 800 block of H Street Northeast. Mr. Cook has moved to suppress that evidence, arguing that the government's warrantless seizure and search of his vehicle violated the Fourth Amendment

[1] The documents considered by the Court in connection with the pending motion include: Indictment [Dkt. No. 1]; Defendant's Motion to Suppress Tangible Evidence ("Mot.") [Dkt. No. 31]; United States' Memorandum in Opposition to Defendant's Motion to Suppress Physical Evidence ("Opp.") [Dkt. No. 32]; Mr. Cook's Reply in Support of his Motion to Suppress ("Reply") [Dkt. No. 34]; Transcript of Motion Hearing dated September 17, 2026 ("9/17/26 Tr.") [Dkt. No. 44]; United States' Supplemental Memorandum in Opposition to Defendant's Motion to Suppress Physical Evidence ("Gov't Supp.") [Dkt. No. 54]; Mr. Cook's Response to the Government's Supplement ("Supp. Opp.") [Dkt. No. 57]; United States' Supplemental Reply in Support of its Opposition to the Defendant's Motion to Suppress ("Gov't Supp. Reply" [Dkt. No. 61]; and Public Transcript of Motion Hearing dated September 25, 2026 ("9/25/26 Tr.") [Dkt. No. 64].

to the United States Constitution. For the following reasons, the Court will deny Mr. Cook's motion to suppress.

## I. BACKGROUND

### *A. Factual Background*

The events at issue occurred over roughly three hours on the night of October 31, 2025, and into the early morning of November 1, 2025. Just after 11:30 p.m., Metropolitan Police Department ("MPD") Officer Abraham Hovsepian and his partner, Officer Carter Maffett, responded to a call near the 800 block of H Street Northeast. See 9/17/26 Tr. at 5:23-6:4; Def. Ex. 1/Gov't Ex. 12 at 23:32:07 (Officer Hovsepian body-worn camera footage).[2] Officer Hovsepian's body-worn camera was on when he arrived at the scene. See 9/17/26 Tr. at 6:5-6; Def. Ex. 1/Gov't Ex. 12. Upon arrival, Officer Hovsepian and his partner spoke with a complaining witness, who alleged that she had been threatened by a man pointing two firearms at her a few minutes earlier, around 11:29 p.m. The complainant's account of what happened is captured on Officer Hovsepian's body-worn camera. See 9/17/26 Tr. at 6:7-8; Def. Ex. 1/Gov't Ex. 12.

As captured on body-worn camera footage, the complainant told Officer Hovsepian that she and the driver of a white vehicle were arguing over who was entitled to a parking space on the north side of H Street. Def. Ex. 1/Gov't Ex. 12 at 23:31:20-23:31:22; see Opp. at 4, Fig. 2.[3] The complainant stayed in her vehicle, and the other driver got out of his and

---

[2] Time references to video exhibits refer to the internal timestamps, which reflect the time of day or night when the video was captured. When a defense exhibit and a government exhibit capture the same footage with the same internal timestamp, both exhibits are cited.

[3] The Court notes that "[i]t is well-settled that hearsay evidence may be considered in resolving a motion to suppress evidence." United States v. Straker, 596 F. Supp. 2d 80, 84 n.4 (D.D.C. 2009). "Hearsay statements, like any other evidence, should be considered in light of

approached her. Def. Ex. 1/Gov't Ex. 12 at 23:33:10-23:33:12. As the two argued while the other driver stood by the complainant's vehicle, a bystander crossed from the other side of the street and inserted himself into the dispute, taking the side of the driver with the white vehicle. Id. at 23:33:23-23:33:33. According to the complainant, the bystander walked up to her vehicle and threatened to "flatten all four of [her] tires." Id. at 23:33:33-23:33:40. The bystander then told the complainant, "I got something for you," and he walked around the corner and out of her sight. Id. at 23:33:45-23:33:50. Moments later, according to the complainant, the bystander returned to the complainant's vehicle and approached her with both arms raised and holding two firearms, which he pointed at her face. Id. at 23:33:51-23:33:59. The bystander also attempted to open the complainant's vehicle door while threatening her. Id. at 23:34:00-23:34:02. The bystander then retreated and walked back around the same corner, and the complainant did not see him again. Id. at 23:34:15-23:34:22. The complainant described the bystander as a Black male with a caramel-brown complexion, scruffy beard, and long dreadlocks, wearing a blue hoodie. Id. at 23:33:23-23:33:29, 23:34:40-23:36:06. She emphasized that the bystander's blue hoodie and dreadlocks stood out to her the most. Id. at 23:35:56-23:35:58. She described the bystander's firearms as black and noted that one had a long bottom, which Officer Hovsepian suggested could be an extended magazine. Id. at 23:36:08-23:36:33.

As also captured on body-worn camera footage, after taking the complainant's statement, Officer Hovsepian relayed the statement and a description of the suspect over his radio. Def. Ex. 1/Gov't Ex. 12 at 23:38:08-48; see 9/17/26 Tr. at 8:12-14. Moments later, around 11:41 p.m., Officer Hovsepian spoke on the phone with an individual listed in his phone

---

their trustworthiness and reliability, and the Court has considered those factors here in relying upon the hearsay statements proffered in this matter." Id. (citation omitted).

as "Ofc. Grant," to whom he relayed the complainant's statement, including that the suspect was "wearing a blue hoodie, which stands out." Def. Ex. 1 at 23:41:27-23:43:06. Around 11:43 p.m., Officer Hovsepian received a phone call from Investigator Anthony Abreu with the Real Time Crime Center ("RTCC"). Id. at 23:45:17.[4] Officer Hovsepian recounted the complainant's statement and the time and location of the incident to Investigator Abreu and, within a few minutes, Investigator Abreu located CCTV surveillance footage of the incident. Id. at 23:45:35-23:52:05. Officer Hovsepian testified that during this phone call, Investigator Abreu told him—based on his review of the footage—that when the suspect left the complainant and the parking dispute for the first time, the suspect "went back to his car and towards the passenger side, and he was leaning in, reaching towards the glove compartment of the vehicle." 9/17/26 Tr. at 16:16-18. Officer Hovsepian asked to be sent a clip of the surveillance footage, and the two ended their call around 11:54 p.m. Def. Ex. 1 at 23:54:02-23:54:37. After hanging up, Officer Hovsepian recounted to his partner that Investigator Abreu said, "I'm reviewing the camera footage, and I don't ever see guns. I see some, like, motion, but I don't see the guns in his hand." Id. at 23:54:45-23:54:53.

Less than ten minutes later, around 12:02 a.m., Investigator Abreu sent a clip of the CCTV footage depicting the incident to Officer Hovsepian and his partner. Def. Ex. 1 at 00:02:05-00:02:40; see Gov't Ex. 13 (clip sent to the officers). The officers watched the clip, and Officer Hovsepian said to his partner, "I don't see anything in his hands." Def. Ex. 1

---

[4] RTCC is a program that allows MPD and other agencies to access security cameras across Washington, DC. See 9/17/26 Tr. at 9:13-15; see also Press Release, Executive Office of the Mayor, Mayor Bowser and MPD Announce New Real-Time Crime Center (Dec. 7, 2023), https://perma.cc/6H7L-R9N2 ("The RTCC will serve as a new dedicated space that will be staffed 24/7 with local, regional, and federal law enforcement agencies to monitor and respond to criminal activities in real time.").

at 00:02:25-00:02:27. After reviewing the CCTV clip, the officers told the complainant someone with MPD would be in touch within a few days, and the officers and the complainant parted ways around 12:06 a.m. Id. at 00:03:25-00:06:35.

Just over an hour later, at approximately 1:11 a.m., MPD Officer Westley Grant and various other MPD and federal law enforcement officers saw a Range Rover SUV parked in the 800 block of H Street Northeast, which RTCC investigators had identified as the vehicle the suspect accessed when he disappeared around the corner during the incident. See Def. Ex. 3/Gov't Ex. 14 at 01:11:14-01:11:20, 01:12:03-01:12:10 (Officer Grant body-worn camera footage). Officer Grant testified that he learned the vehicle's location from a phone conversation with Investigator Abreu. See 9/17/26 Tr. at 67:2-6. Moments after arriving on the scene, Officer Grant radioed to request that a canine unit be dispatched. Def. Ex. 3/Gov't Ex. 14 at 01:11:22-01:11:44. Officer Grant then showed the other officers an email containing Flock camera photos of the suspect's vehicle and the suspect wearing a multicolored jacket; Officer Grant testified that he received the email from Investigator Abreu at 1:04 a.m., around the time the two spoke on the phone. Id. at 01:12:03-01:12:17; see 9/17/26 Tr. at 62:1-4, 67:2-6; Def. Ex. 12/Gov't Ex. 11 (email from Investigator Abreu). Officer Grant showed officers this email at various points before the search and explained that the suspect had been wearing a blue hoodie but had changed into the multicolored jacket. See, e.g., Def. Ex. 3/Gov't Ex. 14 at 01:18:36-01:19:10.

Around 1:13 a.m., Officer Grant radioed his supervisor, Lieutenant Jeremy Kniseley, and told him, "I got the car on lock." Def. Ex. 3/Gov't Ex. 14 at 01:12:54-01:13:10. Officer Grant testified that at this point, if the suspect had walked up to the vehicle, "he was going to be stopped." 9/17/26 Tr. at 89:16. Officer Grant then called Investigator Abreu and told him, "If you see this dude on camera, let me know, and just give me a call." Def.

Ex. 3/Gov't Ex. 14 at 01:14:45-01:15:00. Upon hanging up, Officer Grant told another officer that Investigator Abreu "said [the suspect] is in the club right now." Id. at 01:15:02-01:15:09.

Moments later, Lieutenant Kniseley arrived on the scene. See Def. Ex. 3/Gov't Ex. 14 at 01:15:22-01:15:30. Officer Grant immediately recounted to Lieutenant Kniseley:

> It was a dispute over a parking spot. He went to the car. Came back. Brandished two firearms with extended magazines. And then, like, brandished them, pointed them at the lady, said "Oh, I got something for you," or whatever, and then, like, dipped where she couldn't see. It was this car. RTCC saw it. And he said, "It looks like it's in the glove box." And the dude changed and went in the club. I called RTCC, and he said, "I'm watching the club, I'll let you know when he comes out." So he's good for a stop.

Def. Ex. 3/Gov't Ex. 14 at 01:15:25-01:16:08. During the suppression hearing, Officer Grant testified that this understanding of the incident came from "the RTCC and the previous reporting officers that we had phoned." 9/17/26 Tr. at 90:17-19. He further explained, "I was in constant communication on and off through the whole event with the RTCC." Id. at 87:18-19.

In response to Officer Grant's recitation of the facts known to him, Lieutenant Kniseley asked, "What's our [probable cause]? Do we even need to run the dog? Did anyone see him with the gun?" Def. Ex. 3/Gov't Ex. 14 at 01:16:09-01:16:15. Officer Grant responded, "I think Abreu saw it. He said, 'I think it's in the glove box.'" Id. at 01:16:15-01:16:20. During the suppression hearing, Officer Grant testified, "Investigator Abreu told me he saw the individual around the area of the glove box. We know that from our training and experience that people that are carrying firearms, especially illicit firearms they can't necessarily bring into an establishment that serves alcohol, they put them up in a glove box or, like, a center console." 9/17/26 Tr. at 70:18-24.

A few minutes later, Lieutenant Kniseley asked Officer Grant and the others, "Did we plain-view it pretty well?" Def. Ex. 3/Gov't Ex. 14 at 01:17:58-01:18:05. Officer Grant

responded that he had not, then looked briefly into the back seat of the vehicle and remarked, "I can't even see in the back." Id. at 01:18:00-01:18:11. During the suppression hearing, Officer Grant and Lieutenant Kniseley testified that the rear windows—those in the back seat and trunk—"were heavily tinted." 9/17/26 Tr. at 68:16-17; 9/25/26 Tr. at 26:3-9. Body-worn camera footage shows the same. See, e.g., Def. Ex. 3/Gov't Ex. 14. After looking into the vehicle, Officer Grant showed Lieutenant Kniseley the photos that Investigator Abreu had emailed at 1:04 a.m. The lieutenant asked, "Is this what he's wearing now after he changed?" Officer Grant responded, "Yeah. He had the blue hoodie and now he's changed, I guess into this," meaning the multicolored jacket. Id. at 01:18:13-01:18:30.

Around 1:39 a.m., the canine unit that Officer Grant had requested about thirty minutes earlier arrived on scene. See Def. Ex. 7/Gov't Ex. 15 (Officer Grant body-worn camera footage). The canine circled the vehicle twice and did not alert to the presence of firearms. Id. at 01:40:38-01:42:56. The canine and handler then left the scene without interacting further with the investigating officers. Id. at 01:42:56-01:43:16; see 9/17/26 Tr. at 112:22-113:4.

Around 1:46 a.m., Officer Grant is seen on the phone with someone, ending the call just before 1:47 a.m. See Def. Ex. 8 at 01:46:49 (Lieutenant Kniseley body-worn camera footage). About a minute later, at 1:47:52 a.m., Officer Grant received another email from Investigator Abreu, this one containing screenshots of CCTV footage depicting the vehicle and the suspect, wearing a blue hoodie with long dreadlocks visible, walking to and from the vehicle around the time of the incident. See Gov't Ex. 11 (email from Investigator Abreu to Officer Grant). Officers began attempting to access the vehicle around 1:49 a.m., and succeeded around 1:52 a.m. See Def. Ex. 15/Gov't Ex. 16 at 01:48:30-01:52:00 (Officer Grant body-worn camera footage). Once all four doors were open, officers began searching the vehicle and taking photos.

See id. at 01:52:00-01:53:30. At 1:55 a.m., Lieutenant Kniseley, who was searching the backseat area on the passenger side, pulled a blue hoodie down from the top of the backseat passenger-side headrest. See Def. Ex. 8/Gov't Ex. 17 at 01:54:30-01:55:40. Then, noticing Officer Grant and others struggling to enter the glove box, Lieutenant Kniseley said, "We might have to pry it. So, he specifically saw him going into the glove box?" Id. at 01:55:40-01:55:48. Officer Grant responded, "Yeah." Def. Ex. 15/Gov't Ex. 16 at 01:55:47-01:55:56. Moments later, Officer Grant suggested calling Investigator Abreu, and he got the investigator on the phone at 1:56 a.m. See id. at 01:56:32-01:56:54; 9/17/26 Tr. at 79:13-15. Officer Grant then asked Investigator Abreu, "You said the glove box right? Ok yeah, we're going to have to pry it. I just wanted to double-check that that's the area where he was seen . . . if he's focused on that area, then we'll get it." Def. Ex. 15/Gov't Ex. 16 at 01:57:00-01:57:30.

Lieutenant Kniseley then asked, "Which jacket do we need to take?" Def. Ex. 15/Gov't Ex. 16 at 01:57:30-01:57:32. Officer Grant asked Investigator Abreu, "Which jacket? Can you describe the jacket to me again? It's like a weird, it's all blue, right?" Id. at 01:57:30-01:57:44. Officer Grant and Lieutenant Kniseley then pulled up a photo, and Officer Grant said, "Oh no, yeah, it's this blue hoodie. Look. So, we got the blue hoodie." Id. at 01:58:04-01:58:20.

Returning his focus to the glove box, Officer Grant remarked to Investigator Abreu over the phone, "That would make sense of a sensible place to put it, right, if you can't open it without the key." Def. Ex. 15/Gov't Ex. 16 at 01:58:20-01:58:30; see also 9/17/26 Tr. at 80:4-8. After hanging up with Investigator Abreu, Officer Grant told Lieutenant Kniseley of the glove box, "He said that is like the region he was in and focused on in the car." Def. Ex. 15/Gov't Ex. 16 at 01:58:38-01:58:41. Lieutenant Kniseley responded, "Ok, I guess let's pry

it." Id. at 01:58:48-01:58:51. At 2:00 a.m., the officers opened the glove box, revealing two black firearms, one with an extended magazine. See id. at 02:00:45-02:00:56; Gov't Ex. 19.

### *B. Procedural Background*

On May 20, 2026, the government obtained a federal indictment against Mr. Cook, charging him with two counts of possessing a firearm after having been convicted of a crime punishable for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1), and one count of assault with a dangerous weapon in violation of D.C. Code § 22-402. See Indictment. On August 12, 2026, Mr. Cook moved to suppress all evidence obtained as a result of the vehicle search that occurred on November 1, 2025. See Mot. The government opposed the motion on August 26, 2026, see Opp., and Mr. Cook replied on September 2, 2026, see Reply. The Court held a two-day evidentiary hearing on Mr. Cook's motion, during which it heard testimony from Officers Hovsepian and Grant, Lieutenant Kniseley, and Defense Investigator Celia Sang. See Min. Entry dated Sep. 17, 2026; Min. Entry dated Sep. 25, 2026. At the Court's request, the parties filed supplemental briefs. See Gov't Supp.; Def. Supp.; Gov't Supp. Reply. The Court then held oral argument on Mr. Cook's motion on October 28, 2026. The motion is now thoroughly briefed and argued and is ripe for decision.

## II. LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "Evidence obtained in violation of this guarantee is generally suppressed according to the 'exclusionary rule.'" United States v. Darwah, Criminal No. 25-194 (LLA), 2026 WL 145612, at *4 (D.D.C. Jan. 20, 2026) (quoting United States v. Weaver, 808 F.3d 26, 33 (D.C. Cir. 2015)). Searches conducted without a judicially authorized warrant "are per se

unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Arizona v. Gant, 556 U.S. 332, 338 (2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). When police officers conduct a warrantless search, "the government carries the burden" of establishing that an exception to the warrant requirement applies. United States v. Darwah, 2026 WL 145612, at *5 (quoting United States v. Singleton, 759 F.2d 176, 181 (D.C. Cir. 1985)); see also Chimel v. California, 395 U.S. 752, 762 (1969) ("[T]he general requirement that a search warrant be obtained is not lightly to be dispensed with, and the burden is on those seeking an exemption from the requirement to show the need for it." (citation modified)).

Relevant here, one exception to the warrant requirement is the "automobile exception," which permits police to search a vehicle if it "is readily mobile and probable cause exists to believe it contains contraband." United States v. Williams, 773 F.3d 98, 105 (D.C. Cir. 2014). "If there is probable cause to believe a vehicle contains evidence of criminal activity," officers may search "any area of the vehicle in which the evidence might be found." Arizona v. Gant, 556 U.S. at 347; see also United States v. Ross, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").

"The Supreme Court has described the task of evaluating probable cause as 'a practical, common-sense decision whether, given all the circumstances[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Cardoza, 713 F.3d 656, 659 (D.C. Cir. 2013) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). Probable cause "is an objective standard requiring an analysis of the totality of the circumstances and the facts known to the officers at the time of the search." United States v.

Jackson, 415 F.3d 88, 91 (D.C. Cir. 2005). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence have no place in the probable-cause decision." Florida v. Harris, 568 U.S. 237, 243-44 (2013) (citation modified). All the Supreme Court has "required is the kind of fair probability on which reasonable and prudent people, not legal technicians, act." Id. at 244 (citation modified).

## III. DISCUSSION

### *A. Officers Lawfully Seized Mr. Cook's Vehicle*

Mr. Cook's first argument is that law enforcement officers seized his vehicle without the requisite level of suspicion. See Mot. at 5-6; Supp. Opp. at 27-34. Personal property is "seized" within the meaning of the Fourth Amendment "when 'there is some meaningful interference with an individual's possessory interests in that property.'" Soldal v. Cook County, 506 U.S. 56, 61 (1992) (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)); see also Brower v. County of Inyo, 489 U.S. 593, 597 (1989) (holding that a seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied"). The "general rule" is "that Fourth Amendment seizures are 'reasonable' only if based on probable cause." Dunaway v. New York, 442 U.S. 200, 213 (1979). But "certain brief seizures of personal property for the purpose of conducting a limited investigation may be justified based on 'reasonable, articulable suspicion, premised on objective facts, that the [property] contains contraband or evidence of a crime.'" United States v. Mickens, 810 F. Supp. 3d 75, 79 (D.D.C. 2025) (alteration in original) (quoting United States v. Place, 462 U.S. 696, 702 (1983)); see United States v. Delaney, 955 F.3d 1077, 1085 (D.C. Cir. 2020) (applying the "reasonable and articulable suspicion" standard to the seizure of a person involving the partial blocking of a vehicle). To decide whether officers had reasonable

suspicion, courts examine the totality of the circumstances, considering only "the facts available to the officer at the moment of the seizure." United States v. Castle, 825 F.3d 625, 635 (D.C. Cir. 2016) (quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968)).

Mr. Cook argues that MPD officers and federal agents seized his vehicle when they apprehended and surrounded it and then deployed a canine unit. See Mot. at 6. The government does not contend otherwise, and for good reason. "The D.C. Circuit has recognized, in the context of seizing a person, that 'blocking a vehicle can be the kind of application of physical force that constitutes a seizure.'" United States v. Mickens, 810 F. Supp. 3d at 80 (quoting United States v. Delaney, 955 F.3d at 1083). And "[c]ourts have applied the same principle to seizures of cars." Id.; see, e.g., United States v. Harger, 313 F. Supp. 3d 1082, 1087 (N.D. Cal. 2018) (holding that the government seized a vehicle when officers blocked it in, thereby "intentionally terminat[ing] the vehicle's freedom of movement"). Here, the body-worn camera evidence shows that several MPD officers and federal agents surrounded Mr. Cook's vehicle beginning around 1:11 a.m., frequently walking up to and circling it. See Def. Exs. 3, 5-8, 13; Gov't Exs. 14-18. Minutes later, Officer Grant told Lieutenant Kniseley that he had "the car on lock." Def. Ex. 3/Gov't Ex. 14 at 01:12:54-01:13:02. During the suppression hearing, Officer Grant testified that at that point, "if the suspect had walked up to the vehicle, [Officer Grant] would have stopped them before they could have gotten into the car." 9/17/26 Tr. at 89:21-24. In other words, from essentially the moment Officer Grant arrived on the scene, "there is no question the officers would not have allowed [Mr. Cook] to take his car and leave." United States v. Mickens, 810 F. Supp. 3d at 80. The officers' actions thus constitute a "meaningful interference with [Mr. Cook's] possessory interests in that property." Soldal v. Cook County, 506 U.S. at 61 (quoting United States v. Jacobsen, 466 U.S. at 113).

For the officers' seizure of the vehicle to comply with the Fourth Amendment, the officers must have had at least a reasonable suspicion that the vehicle contained "contraband or evidence of a crime." United States v. Place, 462 U.S. at 702. In opposing Mr. Cook's suppression motion, the government skips reasonable suspicion altogether and argues instead that the facts known to the police satisfied the higher standard of probable cause. See Gov't Supp. at 6.[5] According to the government, the officers' probable cause was "based on the victim's account of what happened to her and the corroborating surveillance footage that connected the defendant's vehicle to the offense." Id.

The Court concludes that the government has carried its burden to show that the officers had probable cause to seize Mr. Cook's vehicle. Law enforcement reasonably relied on the complainant's account of the alleged assault. See Johnson v. District of Columbia, 927 F.3d 539, 548 (D.C. Cir. 2019) (affirming a finding of probable cause premised on "a detailed victim statement identifying [the defendant] as the perpetrator"); Lin v. District of Columbia, 47 F.4th 828, 841 (D.C. Cir. 2022) ("'[I]t is enough' for probable cause 'that the police officer . . . received his information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth.'" (second alteration in original) (quoting Daniels v. United States, 393 F.2d 359, 361 (D.C. Cir. 1968) (per curiam))). Just minutes after the incident, the complainant clearly and comprehensively reported it to officers on the scene.

---

[5] Mr. Cook argues that the government "has conceded that it unlawfully seized the SUV" because it did not respond directly to Mr. Cook's contention that the officers "lacked the necessary suspicion to seize the SUV when officers surrounded it." Reply at 15. The Court disagrees. As the government points out, it responds directly to Mr. Cook's seizure argument in its opposition, albeit briefly. See Opp. at 22. Moreover, the government has maintained that officers had probable cause to search the vehicle, see generally Opp.; Gov't Supp.; Gov't Supp. Reply, which the Court understands necessarily to encompass probable cause to seize the vehicle before searching it. See Gov't Supp. at 6 n.4.

See Def. Ex. 1; Gov't Ex. 12. She provided the officers with a detailed description of the suspect's clothing and physical features—specifically, his long dreadlocks and blue hoodie—and the firearms that he allegedly brandished at her. See id. Within minutes, the officers had relayed this information to the RTCC, where an investigator reviewed surveillance footage from the area that corroborated the complainant's account.

The CCTV footage—which the Court has reviewed extensively—shows the suspect, wearing a blue hoodie with his long dreadlocks visible, crossing the street to insert himself into the parking dispute. See Gov't Exs. 3, 11.



Image 1: Still from Government Exhibit 11 (email from Investigator Abreu to Officer Grant). The suspect is crossing the street walking toward the parking dispute.



Image 2: Still from Government Exhibit 3 (CCTV footage). The suspect is holding up his arm to oncoming traffic as he crosses the street.

The suspect can be seen standing near the complainant's car for several seconds.

See Gov't Ex. 3.



Image 3: Still from Government Exhibit 3 (CCTV Footage). The suspect is standing next to the driver of the white vehicle.

He then leaves the scene and walks to a vehicle parked around the corner. See Gov't Ex. 3.



Image 4: Still from Government Exhibit 3 (CCTV footage). The suspect is walking away from a parking dispute and toward a vehicle.

The video then shows the suspect opening the front vehicle's passenger door, partially entering the front passenger seat for about fifteen seconds, stepping back out of the vehicle, and then walking back to the scene of the parking dispute. See Gov't Exs. 4, 11.



Image 5: Still from Government Exhibit 11 (email from Investigator Abreu to Officer Grant). The suspect is leaning into the vehicle on the front passenger side.



Image 6: Still from Government Exhibit 11 (email from Investigator Abreu to Officer Grant). The suspect is walking away from the vehicle in the direction of the parking dispute.

The suspect then approaches the complainant's front passenger window and can be seen raising at least one arm at her before attempting to open her passenger door. See Gov't Exs. 5, 11, 13. See id.



Image 7: Still from Government Exhibit 11 (email from Investigator Abreu to Officer Grant). The suspect is standing by the front passenger-side door of the complainant's vehicle.



Image 8: Still from Government Exhibit 13 (CCTV clip sent by Investigator Abreu to Officer Hovsepian). The suspect has at least one arm raised and pointed at the complainant.

The suspect then walks back to the vehicle around the corner as a city tow truck arrives on the scene. See Gov't Exs. 5, 6.



Image 9: Still from Government Exhibit 5 (CCTV footage). The suspect is walking away from the parking dispute.

The suspect goes into the driver's seat of that vehicle for about thirty seconds.

See Gov't Exs. 6, 11.



Image 10: Still from Government Exhibit 11 (email from Investigator Abreu to Officer Grant). The suspect is entering the driver's seat of the vehicle.

Then, the suspect exits the vehicle and walks around to the rear passenger side, where he takes off his blue hoodie, places it in the back seat of the vehicle, and changes into a multicolored jacket. See Gov't Exs. 6, 11.



Image 11: Still from Government Exhibit 6 (CCTV footage). The suspect (standing behind the light pole) is removing the blue hoodie.


Image 12: Still from Government Exhibit 11 (email from Investigator Abreu to Officer Grant). The suspect is wearing a multicolored jacket.

Mr. Cook argues that "the CCTV footage does not corroborate the complaining witness['s] statement" because she told the officers on the scene "that she was patiently waiting for a parking spot when another man initiated a parking dispute with her," but the CCTV footage "shows that the alleged victim was the one to initiate the parking dispute." Supp. Opp. at 27-28. The Court rejects this suggestion that the complainant's account was not reliable. For one, the Court disagrees with Mr. Cook's description of the CCTV footage as compared with the complainant's statement. From the Court's review, the parking dispute appears to have arisen exactly as the complainant described, or close to it. The video footage shows the complainant pulling up behind a white vehicle that appeared to be waiting for a parking space and pausing there for about ninety seconds. See Gov't Ex. 3. A red vehicle parked in front of the white vehicle pulls out, and the complainant drives around the white car and pulls into the open space nose first. See id. The driver of the white vehicle then exits his vehicle and walks over to the complainant's vehicle, and the argument ensues. See id. Regardless of whether the complainant was wrong about her entitlement to the parking spot, she did not initiate the dispute with the driver of the white vehicle. Nor did she mischaracterize how the dispute arose. The CCTV

footage matches her account of the moments before the dispute began, as conveyed to Officer Hovsepian and his partner. See Def. Ex. 1; Gov't Ex. 12. More importantly, as described above, the CCTV footage confirms the complainant's account of her interactions with the suspect and the suspect's movements during the incident. Whether or not the complainant was waiting "patiently" for the parking space before the dispute arose does not change that fact. It would not be unreasonable for officers to have relied on the complainant's otherwise corroborated statement about the alleged assault even had she misrepresented the circumstances leading up to the dispute.

Mr. Cook's more meaningful argument is that the CCTV footage does not corroborate the complainant's statement that she was threatened with two guns because "the video does not ever show a firearm." Supp. Opp. at 28. On this point, the Court agrees with Mr. Cook's description of the surveillance footage. The government agrees as well. See Opp. at 19 ("Due to the distant positioning of the camera from the scene, it is not clear what is in the defendant's hands, and his left arm is obscured from view."). So, too, did the officers who reviewed the video on the night of the alleged incident. The evidence reveals that neither Investigator Abreu nor Officer Hovsepian observed firearms in the suspect's hands while reviewing footage on the night of the incident. See Def. Ex. 1 at 23:54:45-23:54:53, 00:02:25-00:02:27; 9/17/26 Tr. at 49:16-24; 93:6-7.

Contrary to Mr. Cook's suggestion, however, the CCTV footage does not establish that the suspect did not have firearms in his hands when he returned from around the corner and approached the complainant's vehicle. Rather, the video's poor quality makes it impossible to see what—if anything—the suspect was holding. The police therefore appropriately relied on the complainant's eyewitness account that the suspect had two guns in his

hands when he approached her. The officers had every reason to believe her account, given that the surveillance footage corroborated it in all meaningful respects, including that the suspect can be seen raising at least one arm at the complainant. See Gov't Ex. 13. As Officer Hovsepian testified, "[t]he grainy video can't really show exactly what was in the hand, but it did match the timeline of what [the complainant] told me." 9/17/26 Tr. at 12:13-14.

To reiterate, officers were not required to have evidence beyond a reasonable doubt, or even by a preponderance, that weapons or other evidence would be found in Mr. Cook's vehicle. See Florida v. Harris, 568 U.S. at 243-44; see also United States v. Burnett, 827 F.3d 1108, 1114 (D.C. Cir. 2016) ("Probable cause is more than bare suspicion but is less than beyond a reasonable doubt and, indeed, is less than a preponderance of the evidence."). The question is whether there was a "fair probability" that evidence of a crime would be recovered. Florida v. Harris, 568 U.S. at 244. Given the complainant's detailed statement, corroborated by video evidence, the answer certainly is yes. See Lin v. District of Columbia, 47 F.4th at 840 (upholding a probable cause determination based on a complainant's statement "that she had been assaulted," which was "corroborated by her physical appearance and emotional state").

Mr. Cook briefly suggests that, even considering the statement and video evidence, officers should be faulted for not taking additional "investigatory steps" before seizing (and ultimately searching) the vehicle, such as approaching the suspect and "speak[ing] with him about the parking incident." Mot. at 7. "Yet '[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.'" Johnson v. District of Columbia, 927 F.3d at 548 (quoting Amobi v. D.C. Dep't of Corr., 755 F.3d 980, 990 (D.C. Cir. 2014)). In any event, the officers had a sensible reason for not wanting to enter into the nightclub where the

suspect was located at the relevant time. As Officer Grant put it: "[I]t was Halloween, and there [were] a lot of people in there, and there [wa]s the potential for an altercation, a public scene and jeopardizing public safety." 9/17/26 Tr. at 68:3-5.

Of course, Mr. Cook is correct that "probable cause under the Fourth Amendment concern[s] what officers who conduct a search and seizure knew at the time they conducted the search and seizure." Supp. Opp. at 29 (emphasis modified); see United States v. Most, 876 F.2d 191, 196 (D.C. Cir. 1989) ("[T]he presence or absence of probable cause must be assessed on the basis of the facts known to the officer at the time he undertook the search."). Accordingly, it would not matter what Officer Hovsepian or Investigator Abreu knew if the officers who seized and ultimately searched Mr. Cook's vehicle did not have the same information. There is one caveat, however. Some circuits have held that the collective action doctrine—which posits that probable cause may be established based on the collective knowledge of multiple officers—permits aggregation of knowledge absent communication between the officers. See United States v. Gorham, 317 F. Supp. 3d 459, 471-73 (D.D.C. 2018) (collecting cases). The D.C. Circuit has not weighed in on this question, but at least one judge in this district has declined to "extend the collective knowledge doctrine to encompass cases in which no actual communication or direction occurs between the officer conducting the search" and "the officer in possession of the information giving rise to the required" level of suspicion. Id. at 473. For present purposes, this Court need not consider how far the collective knowledge doctrine should extend because it concludes that the officers who seized the vehicle had sufficient knowledge to support probable cause based on their communications with other law enforcement personnel—that is, under the more limited collective knowledge construction. See United States v. Hawkins, 595 F.2d 751, 752 n.2 (D.C.

Cir. 1978) (per curiam) ("[T]he whole complex of swift modern communication in a large police department would be a futility if the authority of an individual officer was to be circumscribed by the scope of his first[-]hand knowledge of facts concerning a crime or alleged crime." (quoting Williams v. United States, 308 F.2d 326, 327 (D.C. Cir. 1962))).

The record evidence convinces the Court that the officers who seized and ultimately searched the vehicle had sufficient knowledge to support probable cause based on their communications with officers who had first-hand information. Officer Grant had sufficient knowledge for probable cause when he seized the vehicle, at or around 1:11 a.m. Officer Grant testified that he received information about the alleged assault and location of the vehicle over the phone and by email from Investigator Abreu with the RTCC. See 9/17/26 Tr. at 66:24-67:6; Def. Ex. 1 at 23:49:12-23:54:38. Corroborating Officer Grant's testimony, the record contains an email from Investigator Abreu to Officer Grant sent at 1:04:31 a.m. with screenshots from a Flock camera of the vehicle's license plate as well as three stills of the suspect in a multicolored jacket. See Def. Ex. 12/Gov't Ex. 11. Officer Grant testified that he spoke with Investigator Abreu "around the same time" that he received the email. 9/17/26 Tr. at 67:2-4. Indeed, he testified that he "was in constant communication on and off through the whole event with the RTCC." Id. at 87:18-19. Body-worn camera footage supports that testimony, capturing Officer Grant having phone conversations at several points.

Ten minutes after receiving that email, Officer Grant was captured on body-worn camera accurately recounting the complainant's allegations and CCTV footage to Lieutenant Kniseley. See Def. Ex. 3/Gov't Ex. 14 at 01:15:25-01:16:08. He also stated that Investigator Abreu told him the CCTV footage showed the suspect around the glove box area of the vehicle, which Officer Grant knew from his training and experience was a location where one might hide

a weapon. See id.; see also 9/17/26 Tr. at 70:18-71:2. In addition, Officer Grant is heard on body-worn camera footage at various points telling other officers that the suspect had been wearing a blue hoodie but changed into a multicolored jacket. See, e.g., Def. Ex. 3/Gov't Ex. 14 at 01:18:36-01:19:10. During cross-examination, Officer Grant testified that the details he communicated to Lieutenant Kniseley came "[f]rom the RTCC" and from "the previous reporting officers that we had phoned." 9/17/26 Tr. at 90:17-19. That testimony is consistent with Officer Hovsepian's body-worn camera footage, which depicts him relaying the complainant's statement to "Ofc. Grant" moments after taking it. See Def. Ex. 1 at 23:41:27-23:43:06. By this point, after being told the facts known to Officer Grant, Lieutenant Kniseley also had sufficient knowledge to support probable cause.

To summarize: Officer Hovsepian and his partner took the statement of an eyewitness complainant mere minutes after she was allegedly assaulted. Moments after taking the complainant's statement, Officer Hovsepian recounted it to Officer Grant and then to Investigator Abreu, who pulled CCTV footage corroborating the complainant's account. Investigator Abreu then communicated the findings from his review of the CCTV footage directly to Officer Grant. By the time Officer Grant arrived at the scene, he knew the key details of the alleged assault and of the suspect's interactions with the vehicle, including that the suspect had been seen around the glove box area, which officers knew to be a place where firearms are stored. See Def. Ex. 3/Gov't Ex. 14 at 01:15:25-01:16:08. On this record, the Court concludes that the government has established that the officers had probable cause to seize Mr. Cook's vehicle based on their belief that it contained weapons and other evidence, namely, the suspect's blue hoodie.

*B. Officers Lawfully Searched Mr. Cook's Vehicle*

Mr. Cook's second argument is that regardless of whether the officers had probable cause to believe that his vehicle contained contraband or evidence of the alleged assault at the time of the seizure, that probable cause dissipated by the time they searched the vehicle more than thirty minutes later. See Mot. at 7; Supp. Opp. at 34. The D.C. Circuit has held that probable cause may dissipate upon the discovery of new facts. See Lin v. District of Columbia, 47 F.4th at 841 ("A corollary of the rule that probable cause requires a totality-of-the-circumstances analysis is that new facts can negate probable cause." (citation modified)). Mr. Cook argues that two different occurrences negated the probable cause that existed when officers seized the vehicle: a canine swept the vehicle but did not alert to the presence of a firearm, and officers did not see the suspect's blue hoodie in plain view in the vehicle.

1. Canine Non-Alert

Mr. Cook contends that even if the officers had probable cause to seize the vehicle around 1:11 a.m., "[w]hen the canine failed to give any indication that there were firearms in the SUV, officers' justification to seize the car fully dissipated." Mot. at 7. In his supplemental briefing, Mr. Cook takes the position "that a well trained firearm detecting police canine's indication that there are no firearms in a vehicle dissipates any probable cause that the vehicle contains firearms." Supp. Opp. at 38. But that is not an accurate statement of the weight of authority. When the police have probable cause to search a vehicle, a subsequent canine non-alert does not automatically negate the established probable cause. See United States v. Davis, 430 F.3d 345, 367 (6th Cir. 2005) (Sutton, J., concurring in part and dissenting in part) ("[C]ases reveal a near universal recognition that a drug-sniffing dog's failure to alert does not necessarily destroy probable cause . . . ."); see also, e.g., United States v. Villafranco-Elizondo, 897

F.3d 635, 644 (5th Cir. 2018) ("[W]e have previously rejected the notion that the failure of a drug dog to alert deprives officers of existing probable cause."); United States v. Edwards, 891 F.3d 708, 712 (8th Cir. 2018) ("A drug dog's failure to alert is relevant but not dispositive." (citation omitted)); United States v. Ramirez, 342 F.3d 1210, 1213 (10th Cir. 2003) ("We will not require investigators to cease an otherwise reasonable investigation solely because a dog fails to alert, particularly when we have refused to require that a dog sniff test be conducted at all."); United States v. Beal, 536 F. Supp. 3d 743, 752 (D. Haw. 2021) ("[T]his probable cause to believe the vehicle contained drugs was not eliminated by the failure of a drug-sniffing dog to alert when conducting an open-air sniff around the vehicle."); United States v. Duran, 884 F. Supp. 552, 554-56 (D.D.C. 1995) (finding probable cause notwithstanding a negative canine sweep).

Mr. Cook relies primarily on the Sixth Circuit's decision in United States v. Davis to argue that the officers' probable cause dissipated once the canine did not alert to the presence of firearms. See Mot. at 7. That case, however, does not carry the day for Mr. Cook. In Davis, the majority concluded that police had reasonable suspicion to detain the defendant for the limited purpose of bringing a drug-sniffing dog to the scene based on the police observing the defendant interacting with a suspected drug dealer. See United States v. Davis, 430 F.3d at 354. The majority held that "[o]nce the drug-sniffing dog was brought to the scene and failed to alert positively to the presence of narcotics in the vehicle, the officers' suspicions that Davis was in possession of narcotics were dispelled." Id. at 356. In so holding, the majority acknowledged the substantial authority supporting that "an investigatory dog's failure to alert does not dispel probable cause." Id. But it distinguished that authority on the grounds that in those cases, "the courts determined that even without the dog's alert there was probable cause to justify a more

extended detention, whereas in this case there was only the more limited basis of reasonable suspicion." Id. At most, then, Davis supports the proposition that a highly trained and credible canine's non-alert may negate officers' reasonable suspicion; it does not support that such a non-alert dissipates probable cause. See id.; accord United States v. Beal, 536 F. Supp. 3d at 752.[6] Indeed, Mr. Cook does not identify any case in which a court found existing probable cause was destroyed based on a canine's failure to alert.

The Court concludes that the canine's failure to alert to the presence of firearms here did not destroy the officers' probable cause to search the vehicle. As described above, officers on the scene had ample existing cause to believe that the vehicle contained weapons and other evidence before the canine sweep. To be sure, the canine's non-alert factors into the totality-of-the-circumstances analysis. See United States v. Edwards, 891 F.3d at 712. But "[t]he evidence of criminal activity here was strong enough to establish a substantial chance that the dog might have been mistaken or unable to perceive [firearms] that were within the vehicle." Id.

2. Absence of a Hoodie in Plain View

Mr. Cook also argues that even if the officers had probable cause to seize the vehicle around 1:11 a.m., that cause dissipated by the time the officers searched the vehicle around 1:49 a.m. because "[i]n thirty minutes of searching the car from the outside, not a single

[6] As Judge Sutton recognized in his partial dissent in Davis, there are good reasons for treating a dog sweep as nondispositive in the probable cause analysis. See United States v. Davis, 430 F.3d at 367 (Sutton, J., concurring in part and dissenting in part). Most obviously, "[c]anine searches are not infallible." Id.; see Illinois v. Caballes, 543 U.S. 405, 411 (2005) (Souter, J., dissenting) ("The infallible dog, however, is a creature of legal fiction."); United States v. Mickens, 810 F. Supp. 3d at 86-88 (granting motion to suppress upon finding, "based on the totality of the evidence, that [a canine's] positive alert was not a reliable indicator of the presence of narcotics").

officer saw the blue hoodie that they were allegedly looking for." Supp. Opp. at 36. During the suppression hearing, when asked about the officers' decision to search the vehicle notwithstanding the canine's failure to alert, Officer Grant testified that "after the K9, when [officers] were looking around the vehicle again, the jacket was spotted in the back seat, the light blue jacket." 9/17/26 Tr. at 76:8-10. Upon further inquiry by the Court, Officer Grant testified:

> Oh, while I was looking through the window, we shined our flashlights to get a better view inside the vehicle. We saw it in the back seat, kind of halfway between the trunk and the back seat. Me and the lieutenant were talking. He goes, "Was that the jacket?" I pulled out the video and the photo—not a video, photo, and we looked. And I was like, "That is the hood[ie]. That is the blue hood[ie]," and it's in the same general location where the subject was seen changing his clothes to the multicolor jacket.

Id. at 76:18-77:2.

During cross-examination, however, Officer Grant walked back this testimony, acknowledging that he "was not on body-worn camera remarking about the blue sweatshirt until [he] was grabbing it" after officers had already begun the vehicle search. 9/17/26 Tr. at 118:13-14. In fact, as defense counsel's cross-examination made clear, no officer on the scene was captured on body-worn camera commenting on the blue hoodie in plain view in the back seat. See id. at 99:18-23; 101:6-16. The Court attempted to clarify Officer Grant's testimony, asking: "There was a point where I believe you said you saw the blue sweatshirt or blue hood[ie] in the car through the window; is that right?" Id. at 118:15-17. Officer Grant responded, "I don't recall, Your Honor. I do remember it was seen in the car." Id. at 118:18-19. He continued, "I remember Lieutenant Kniseley telling me about the blue hood[ie] because he has multiple people look at it before we started opening the car." Id. at 119:7-9.

Lieutenant Kniseley, for his part, never testified that he saw the blue hoodie in plain view in the vehicle's back seat. Instead, Lieutenant Kniseley testified on direct that he

"could see in the rear passenger seat that there was fabric that was consistent with clothing on both the seat, like where one might actually sit with their posterior, and then on top of the back rest of that rear seat." 9/25/26 Tr. at 29:8-11. He "could not identify the specific color, just merely that they were dark colors." Id. at 29:15-16. During cross-examination, Lieutenant Kniseley reiterated: "I could see just that there was what appeared to be fabric that was consistent with clothing, like outerwear. But I didn't know whether it was a hoodie, a jacket. I didn't know if it was blue, gray. I could just tell it was like dark-in-color fabric." Id. at 72:16-23. In other words, Officer Grant testified that Lieutenant Kniseley had seen the hoodie in plain view before the search, but Lieutenant Kniseley testified that he had not.

What is more, despite Officer Grant's testimony that when he and Lieutenant Kniseley spotted the hoodie in plain view, they "pulled out the . . . photo, and we looked," 9/17/26 Tr. at 76:23-24, there is no evidence in the record that Officer Grant had a photo of the blue hoodie after the canine search but before he turned his body-worn camera back on, when he claims that he saw the blue hoodie. Investigator Abreu emailed Officer Grant photos of the suspect wearing a blue hoodie at 1:47:52 a.m., when both Officer Grant's and Lieutenant Kniseley's body-worn cameras were on. Yet, as explained above, the purported interaction that Officer Grant testified about was not captured on body-worn camera.

The government therefore has not established that officers on the scene observed a blue hoodie in plain view before searching the vehicle. Based on this conclusion, Mr. Cook insists that the Court should not credit either Officer Grant's or Lieutenant Kniseley's testimony. See Supp. Opp. at 21. As to Officer Grant, the Court has no reason to believe that he deliberately lied on the stand about seeing the hoodie in plain view, as opposed to misremembering or misunderstanding what Lieutenant Kniseley told him at the time of the

search. In any event, nearly all of Officer Grant's testimony—apart from his testimony about seeing the hoodie in plain view—is corroborated by other sources, such as other testimony and body-worn camera footage. So although the Court does not find Officer Grant's statement about seeing the hoodie in plain view credible, it will not disregard the rest of his testimony based on that finding.

Nor will the Court disregard the rest of Officer Grant's testimony based on Mr. Cook's assertion that Officer Grant "lied in his [incident] report" about the search. Supp. Opp. at 22. To be sure, Officer Grant's report gives the Court pause. Mr. Cook correctly points out that the report does not mention that a canine swept the vehicle and failed to alert, which strikes the Court as a not insignificant omission. See Def. Ex. 10 (incident report). That said, what the report includes is accurate, though terse. The report notes that the searched vehicle had been involved in a separate incident, that Officer Grant learned the vehicle's location from RTCC, and that officers "observed clothing from the previous incident" in plain view. Id. The latter assertion is consistent with Lieutenant Kniseley's testimony and body-worn camera footage, which shows clothing on the back seat of the vehicle, visible through the tinted windows. See Def. Ex. 5/Gov't Ex. 18 at 1:19:10-11 (Officer Boone body-worn camera footage).[7]

---

[7] The Court disagrees with Mr. Cook's assertion that the vehicle's highly tinted windows made it impossible to see into the back seat, so the officers could not have seen the hoodie or any other clothing in plain view. See Supp. Opp. at 26; 9/25/26 Tr. at 92:20-94:16. Mr. Cook's assertion is premised on the testimony of defense investigator Sang, who testified that she had attempted to look into the back seat of Mr. Cook's vehicle about a week before the suppression hearing but "was not able to see anything in the inside of the vehicle." Id. at 94:5. In body-worn camera footage, however, fabric consistent with clothing can be seen through the tinted backseat windows at various points. See Gov't Ex. 18 at 1:19:10-11. There is also footage of an officer looking through the non-tinted front windows into the back seat where the back seat headrest is clearly visible. See Def. Ex. 6 at 1:18:22-1:18:35.




Image 13: Still from Defense Exhibit 5 (Officer Anthony Boone body-worn camera). Officer Boone is looking into the rear passenger-side window.

As for Lieutenant Kniseley, his testimony about seeing clothing in plain view remained consistent throughout his time on the stand. Compare 9/25/26 Tr. at 29:8-11, 29:15-16; with id. at 72:16-23. Mr. Cook contends that the Court nonetheless should not credit Lieutenant Kniseley's testimony because he purportedly "committed numerous body-worn camera violations the night of the search." Supp. Opp. at 24. Even assuming that Mr. Cook is correct, it is unclear to the Court how those asserted violations of MPD policy would bear on Lieutenant Kniseley's credibility as a witness. Mr. Cook also points out that "Lieutenant Kniseley has been previously disciplined for submitting a false report concerning a Fourth Amendment violation." Id. at 25. The Court agrees that Lieutenant Kniseley's prior inaccurate

report is relevant to a credibility determination. That said, Lieutenant Kniseley testified that the inaccurate information in the prior report resulted from his clicking the wrong buttons on a drop-down menu, accidentally selecting that a vehicle search was a protective pat-down and a search of a person was a consent search. See 9/25/26 Tr. at 81:20-24. Lieutenant Kniseley also testified that he pointed out the error when he was shown the report. See id. at 82:6-10. Although Lieutenant Kniseley's error certainly is relevant, it does not convince the Court to disregard his testimony wholesale.

Returning to the issue of plain view, Mr. Cook argues that "if the Court believes the government that officers could see through the windows using flashlights from different angles, then the Court must believe that officers thoroughly searched the SUV through the windows, and never saw the blue hoodie they supposedly thought was inside the SUV." Supp. Opp. at 36. According to Mr. Cook, if officers could see anything through the vehicle's tinted backseat windows, the officers must have come to believe affirmatively that the hoodie was not in the back seat of the vehicle, meaning that the government "cannot rely on belief about the hoodie being in the car to justify breaking into the SUV." Id. at 37. That argument does not persuade, either. Body-worn camera footage supports Lieutenant Kniseley's testimony that clothing was visible in the back seat, but its exact shape and color could not be discerned. Officers could neither see well enough to be sure the blue hoodie was in the vehicle, nor could they see well enough to be sure it was not. In essence, the officers were in the same position after looking into the vehicle as before doing so. And as described above, before they looked into the vehicle, officers had probable cause to search it.[8]

---

[8] To the extent Mr. Cook argues that the officers believed their probable cause was based on observing clothing in the back seat, that argument fails because probable cause "is an objective standard." United States v. Jackson, 415 F.3d at 91.

*C. Officers Lawfully Searched the Glove Box of Mr. Cook's Vehicle*

Mr. Cook argues that even if officers had probable cause to enter the vehicle to search for the blue hoodie, they lacked probable cause to pry open the locked glove box to search for firearms. See Supp. Opp. at 42-43. Under United States v. Ross, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Ross, 456 U.S. at 825. Because officers had probable cause to search the vehicle for firearms, as described above, they were permitted to search any area of the vehicle that could conceal a firearm, "including the glovebox, seats, floorboards, and any bags therein." United States v. Mitchell, Criminal No. 23-176 (JMC), 2024 WL 68254, at *7 (D.D.C. Jan. 5, 2024).

Moreover, both Officers Grant and Hovsepian testified that Investigator Abreu told them that he saw the suspect "around the area of the glove box." 9/17/26 Tr. at 72:18-19; see id. at 16:16-18. That testimony is consistent with Officer Grant's statement to Lieutenant Kniseley around 1:15 a.m., captured on body-worn camera. See Def. Ex. 3/Gov't Ex. 14 at 01:15:25-01:16:08. Officer Grant further testified, "We know that from our training and experience that people that are carrying firearms, especially illicit firearms they can't necessarily bring into an establishment that serves alcohol, they put them up in a glove box or, like, a center console area, under a seat are common places to put firearms." 9/17/26 Tr. at 70:19-24. And before prying open the glove box, Officer Grant confirmed with Investigator Abreu that the suspect was seen in that area. See Def. Ex. 15/Gov't Ex. 16 at 01:57:00-01:58:30. To the extent more was needed, then, officers had reason to believe that firearms would be found specifically in the passenger-side glove box of Mr. Cook's vehicle. Their search of the glove box was consistent with the Fourth Amendment.

## IV. CONCLUSION

For the foregoing reasons, Defendant Gerald Cook's Motion to Suppress Tangible Evidence [Dkt. No. 31] is DENIED. An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 11/13/26